IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NGX COMPANY,

    Plaintiff,

vs.                                            Civil No. 05-1120 WJ/RLP

G.B. PETROLEUM SERVICES, L.L.C.,
GREAT BASIN PETROLEUM SERVICES, L.P.,
and GREAT BASIN PETROLEUM SERVICES, INC.,

    Defendants.

**MEMORANDUM OPINION AND ORDER ON DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
PLAINTIFF'S UNFAIR PRACTICES ACT CLAIM**

THIS MATTER comes before the Court pursuant to Defendants' Motion for Partial Summary Judgment as to NGX Company's Claim Under the Unfair Practices Act Claim (Doc. 130). Having reviewed the submissions of the parties, I conclude the motion is well taken in part and will be granted in part and denied in part.

**BACKGROUND**

Plaintiff NGX filed its initial Complaint in this matter on October 21, 2005, filed an Amended Complaint on March 14, 2006, and filed a Second Amended Complaint on September 25, 2006. The Second Amended Complaint essentially alleges that NGX contracted with Defendants (collectively referred to as "Great Basin") to provide oil field brine hauling services to NGX for its oil wells. Count VI alleges that Great Basin violated the New Mexico Unfair Practices Act ("UPA"), N.M. Stat. Ann. 1978 § 57-12-2, by misrepresenting at the time of contracting that it would haul brine off the oil field for disposal when it in fact intended to dispose

of some of the produced water in a workover pit and a drilling pit on the oil field. Additionally, NGX alleged that Great Basin violated the UPA by misrepresenting at the time of contracting that it would haul and dispose of NGX's produced water for $1.00 a barrel because it later charged more than $1.00 per barrel and tacked on disposal fees and surcharges. Finally, NGX alleged that Great Basin violated the UPA when it billed NGX for water hauling and disposal service when it had improperly disposed of water.

In 2003 or 2004[1], John Parra on behalf of Great Basin and George Scott, III on behalf of NGX orally agreed that Great Basin would haul produced water for NGX at $1.00 per barrel. At the time, NGX was having its produced water hauled by someone else. Great Basin neither verbally agreed nor stated that its price would remain forever static. As is customary in the oil patch, business arrangements between oil producers and water haulers are formed on a job-by-job basis and are dependent on truck rates.

During the course of the business relationship between the parties, NGX would request or place an order with Great Basin for Great Basin to perform produced water hauling or other oil well services, and Great Basin would then perform the service. Great Basin work tickets indicate that, for approximately the first year after the oral agreement, Great Basin hauled water exclusively from the McKee State #1 well ("McKee well") and the Boggs Fee #1 well ("Boggs well") which are located on different leaseholds than the Tecolote well and Experimental well. The Tecolote and Experimental wells are both located on the Sandpoint lease.

---

[1] In all of the dispositive motions filed in this case, the parties have never had occasion to identify the time at which these parties initially formed a business relationship. While the Second Amended Complaint ¶ 10 alleges that the parties first contracted with one another in 2004, here, NGX presents testimonial evidence that the relationship was formed in 2003 or 2004 and that evidence is undisputed by Great Basin.

Great Basin charged $1.00 per barrel for approximately one year while it was hauling produced water from the McKee and Boggs wells but was later forced to raise its prices as well as charge a disposal fee and fuel surcharge to all of its customers so that it could stay in business. Great Basin did not begin hauling produced water from the Sandpoint lease until approximately late July 2004 and ceased hauling produced water from the Sandpoint lease in May 2005. Two work tickets are dated in January 2004 but these are dated in error because the serial numbers on the work tickets fall within a series that was not used until January of 2005. At the time Great Basin began hauling produced water from the Sandpoint lease, Great Basin's work tickets indicate that it had already been charging NGX $1.20 per barrel with an additional $.35 disposal fee. Shortly thereafter, Great Basin's work tickets indicate that Great Basin's hauling rate decreased to $1.10 and remained at that price until Great Basin ceased hauling produced water for NGX in June 2005.

During the two years that Great Basin hauled produced water for NGX, Great Basin, in the normal course of business, generated a work ticket for each hauling trip that, among other things, itemized the various charges for that trip. Normally, John Molina at Great Basin would generate invoices when he received original work tickets then bill a customer by submitting invoices with work tickets attached. However, with respect to NGX, Mr. Parra would deliver batches of work tickets personally to Mr. Scott before Mr. Molina had generated an invoice, and NGX would provide immediate payment on the basis of the work tickets. NGX paid work tickets submitted by Great Basin for water hauling which included charges in excess of $1.00. NGX also paid work tickets submitted by Great Basin for water hauling which included disposal fees and fuel surcharges. At no time did Mr. Scott verbally complain to Mr. Parra concerning the

3

increased charges. However, Mr. Scott did complain by letter to Mr. Molina in August 2005[2] that the originally promised price of $1.00 per barrel had been progressively raised during the business relationship without any prior notice of the increase.

By letter to Mr. Parra dated September 21, 2004, Sashua Patton, a "Production Analyst/ Administrative Assistant" at NGX, noted that Great Basin was charging more than $1.00 per barrel on some of its invoices. She wrote, "I understand that costs rise, and do not argue the need to charge more for the work when this happens, however, in the future I would like to ask that we be notified of any rate increases." Def's. Ex. F. NGX disputes that Ms. Patton had authority to approve rate increases on behalf of NGX. They also claim that Mr. Parra's own testimony indicates he did not believe she had such authority. However, Mr. Parra's testimony was that he believed Ms. Patton was acting at the direction of Mr. Scott. Pl's. Ex. B p. 215 lines 16-17. It is undisputed that, at some time after Ms. Patton sent the letter, NGX became aware of the letter and did not advise Mr. Parra or anyone at Great Basin that Ms. Patton lacked authority to send the letter.

Great Basin concedes that one of its drivers, on a single occasion, disposed of ten barrels of produced water pulled from the Tecolote well into a drilling pit located on a Mewbourne Oil Company lease, and that Great Basin did mistakenly charge NGX for disposal of this produced water. NGX points out evidence suggesting Great Basin may have improperly disposed of produced water on other occasions. An Oil Conservation Division ("OCD") field investigator at one time saw a Great Basin truck collecting produced water from an NGX site. He also noted a

---

[2]Great Basin filed a lien against NGX's wells on June 24, 2005 for alleged nonpayment of services. See Second Amended Complaint ¶ 18. NGX filed its original Complaint requesting lien cancellation on October 21, 2005. Mr. Scott's letter was written between these dates.

4

well-used road leading from that site off in a direction that was not indicated in his records as the site of any well.  Accordingly, he drove up the road to what is referred to as the Pronghorn No. 2 ("Pronghorn").  He found an open drilling pit, and there was produced water in the pit.

The company in charge of the Pronghorn (not a party to this action) had an oil field security contractor install a hidden camera at the site that was motion activated to take and instantly email photographic images to the security contractor.  The camera captured images of a tractor trailer on the site.  By the time one of the security contractors arrived, the truck had gone, but the contractor noted liquid in the drilling pit that was "nasty looking" with foam, bubbles and residue.  Within the next few days, the same person drove by several water hauling businesses in the area and saw no tractor trailers with any marking similar to the truck in the photograph except a rig at Great Basin.

Mr. Keel, a former driver for Great Basin, testified that he worked for Great Basin for approximately eight months.  He was not sure of the time during which he worked for Great Basin, but thought that it was hot at the time, so maybe in the summer.  His testimony is not clear whether this was in 2003 or 2004.  At one point, he testified that he may have started in May and it might have been 2003, but he is clear that he is not at all sure.  Beginning about three months after he began working for Great Basin and continuing throughout the rest of his employment, Mr. Keel was instructed by Mr. Parra on more than twenty occasions to dispose of produced water at the Pronghorn location.  Mr. Keel saw four other drivers, Tommie, Frank, Wayne and Novie, doing the same thing at the Pronghorn pit on several occasions.  However, Mr. Keel never disposed of produced water at Pronghorn that he had taken from an NGX location because NGX

5

required a disposal ticket, and he never knew from where the other drivers' produced water was taken.

From October through December 2003, a time period that would coincide with Mr. Keel's disposal of produced water at Pronghorn if he started his employment with Great Basin in May 2003, Great Basin submitted to NGX several work tickets generated by four Great Basin drivers, Tommie, Frank, Wayne and Novie, for hauling and disposing of produced water. However, these work tickets were for hauling produced water from the McKee well which is 20 miles south of Carlsbad while the Sandpoint lease on which the Pronghorn site is located is 12 1/2 miles east of Carlsbad. The shortest route between the two, including dirt roads, is forty miles, and the driving time is about an hour. By comparison, there is a disposal site approximately five or six miles and a ten minute drive from the McKee well. Additionally, Great Basin's payroll records indicate that Mr. Keel applied for employment with Great Basin in January 2004, received his first paycheck from Great Basin in February 2004 and received paychecks for a little over seven months.

On yet another occasion, an NGX contract pumper observed tire tracks consistent with a water hauling truck running between the State No. 1 location and a workover pit at the Experimental well. He observed produced water in the Experimental workover pit at the time. This occurred in 2004 or 2005.

Great Basin filed the instant motion for partial summary judgment on NGX's UPA claim in Count VI arguing that there is no evidence that Great Basin knowingly made any false or misleading statements at the time of contracting concerning the hauling services it would provide to NGX or the price it would charge for such services. Great Basin does not seek summary

judgment with regard to Count VI to the extent it alleges that Great Basin violated the UPA when it charged NGX for water hauling services when the water had been disposed of improperly.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000). The burden of showing an absence of a genuine issue of material fact falls upon the moving party. See Adler v Wal-Mart Store, Inc., 144 F.3d 664, 670 (10th Cir. 1998). However, when the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by pointing out to the Court that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v Catrett, 477 U.S. 317, 322-23 (1986); Adler, 144 F.3d at 671. The nonmoving party must then go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial sufficient to support a verdict for the nonmovant. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). In ruling on a motion for summary judgment, a Court does not weigh the evidence, but determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1150 (10th Cir. 2005). In making this determination, the Court must construe all the facts in the record and reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party. Worrell, 219 F.3d at 1204.

**DISCUSSION**

I.    THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. 1978 § 57-12-2.

The UPA makes unlawful a false or misleading statement knowingly made in connection with the sale of goods or services by a person in the regular course of his trade or commerce which may or does deceive or mislead any person.  N.M. Stat. Ann. 1978 § 57-12-2(D).  Included among the prohibited acts are:

> . . .
> (7) representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another.
> . . .
> (11) making false or misleading statements of fact concerning the price of goods or services . . ..

N.M. Stat. Ann. 1978 § 57-12-2(D) (7) and (11).

> In order to establish a claim under the UPA, a plaintiff must prove four elements:
>
> First, the complaining party must show that the party charged made an "oral or written statement, visual description or other representation . . ." that was either false or misleading.  Second, the false or misleading representation must have been "knowingly made in connection with the sale, lease, rental or loan of goods or services in the extension of credit or . . . collection of debts . . .."  Third, the conduct complained of must have occurred in the regular course of the representer's trade or commerce.  And, fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person."

Ashlock v. Sunwest Bank of Roswell, 753 P.2d 346, 347 (N.M. 1988) overruled on other grounds, Gonzales v. Surgidev Corp., 899 P.2d 576, 583 (N.M. 1995) (internal citations omitted).  In Ashlock, the New Mexico Supreme Court held that the "knowingly made" requirement did not require an intent to mislead.  753 P.2d at 347-48.  However, the Court later clarified that a false or misleading statement must still be made knowingly.  Stevenson v. Louis Dreyfus, Corp., 811 P.2d 1308, 1311 (N.M. 1991).  "The knowingly made requirement is met if a party was actually aware that the statement was false or misleading when made, or in the exercise

8

of reasonable diligence should have been aware that the statement was false or misleading." Id. at 1311-12.

II.  NGX'S CLAIM THAT GREAT BASIN VIOLATED THE UPA BY MAKING FALSE STATEMENTS AT THE TIME OF CONTRACTING REGARDING THE PRICE IT WOULD CHARGE FOR ITS SERVICES

It should be noted that NGX did not dispute for purposes of this motion, and this issue in particular, most of Great Basin's asserted undisputed material facts. NGX did point out that Mr. Scott, after Great Basin filed its lien against NGX's wells, wrote a letter complaining about Great Basin having raised its prices progressively during the relationship. NGX also argued that Ms. Patton had no authority to approve rate increases and characterized Mr. Parra as testifying that he did not reasonably rely on any belief that she had authority. However, the testimony to which NGX points does not, when read fully, support NGX's position. Mr. Parra's testimony was that he did not believe that Ms. Patton herself had authority to approve rate increases but believed that she was acting at Mr. Scott's direction in her communications regarding rates.

The evidence shows only that Great Basin did, in fact, raise its rates over time. There is no evidence that Mr. Parra or anyone at Great Basin knowingly made a false or misleading statement, at the time of the formation of a contract, regarding the rates. Even if a fact finder later determines that Great Basin breached a contract in raising its rates, this is not sufficient to show a violation of the UPA absent evidence of a false or misleading statement knowingly made at the time of contract formation. See Stevenson, 811 P.2d at 1311; Hubbard v. Albuquerque Truck Center, Ltd., 958 P.2d 111, 118-119 (N.M. App. 1998). Accordingly, Great Basin is entitled to partial summary judgment with regard to this portion of Count VI.

III.  NGX'S CLAIM THAT GREAT BASIN VIOLATED THE UPA BY MAKING FALSE STATEMENTS AT THE TIME OF CONTRACTING REGARDING THE SERVICES IT WOULD PERFORM

When Great Basin originally filed its motion, it contended that, "There is no evidence that John Parra, or any other employee at Great Basin, had knowledge or intent at the time of the making of the agreement that a Great Basin driver, two years later, would improperly dispose of some Tecolote water at the Newbourne drilling pit or that a driver would improperly dispose of water pulled from the Sandpoint lease on any other alleged occasion in late 2004."  In response, NGX noted that it was still attempting to depose Mr. Keel, a former driver for Great Basin, and that it believed he would testify that he was instructed by Mr. Parra, around the time of the formation of the contract with Great Basin, to dispose of produced water for other companies in a remote drilling pit.  NGX requested that it be permitted to supplement its response with Mr. Keel's testimony.

On April 5, 2007, the Court ordered supplemental briefing on this motion with briefing to include any relevant testimony from Mr. Keel (Doc. 171).  On May 30, 2007, NGX filed a supplemental response (Doc. 182), and on June 13, 2007, Great Basin filed a supplemental reply (Doc. 183).  The nature of Mr. Keel's testimony, described above, suggests that Mr. Parra was not only aware of, but complicit in a practice of improper disposal of produced water sometime in 2004.  While the evidence is not precise with regard to the time frame of these events nor with regard to the time at which the parties' business relationship began, there is sufficient evidence from which a reasonable jury could find that Mr. Keel's testmony relates to the same general time as Mr. Parra's representations on behalf of Great Basin with regard to the services Great Basin would provide to NGX.

10

In its reply brief, Great Basin argues that Mr. Keel's testimony is inadmissible under Fed. R. Civ. P. 404(b). The conduct described by Mr. Keel does not relate to any produced water from NGX wells and does not relate to improper disposal of produced water into any drilling or workover pit at issue in this case. Thus, argues Great Basin, the evidence is inadmissible evidence of other acts to show action in conformity in this case.

For purposes of this motion, I conclude that Rule 404(b) does not preclude Mr. Keel's testimony. Rule 404(b) is a rule of inclusion rather than exclusion. U.S. v. Sarracino, 131 F.3d 943, 949 (10th Cir. 1997). In this context, Mr. Keel's testimony is offered to show Mr. Parra's knowledge of a practice of improper disposal at the time he represented to NGX the services that Great Basin would provide. As such, it is not impermissible character evidence under Rule 404(b). For purposes of this motion, I will consider the evidence and conclude that a reasonable jury could infer that Mr. Parra knowingly made false or misleading statements regarding Great Basin's services at the time of contract formation. Thus, Great Basin is not entitled to summary judgment with regard to this aspect of NGX's claim in Count VI.

I note again that Great Basin did not seek summary judgment with regard to Count VI to the extent it alleges that Great Basin violated the UPA when it charged NGX for water hauling services when the water had been disposed of improperly. Thus, this allegation remains undisturbed by this ruling.

**CONCLUSION**

IT IS THEREFORE ORDERED that Defendants' Motion for Partial Summary Judgment as to NGX Company's Claim Under the Unfair Practices Act Claim (Doc. 130) is hereby

GRANTED IN PART AND DENIED IN PART as set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE